UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ORACLE CORPORATION, ORACLE USA INC. and ORACLE INTERNATIONAL CORPORATION,<br><br>500 Oracle Parkway, Redwood City, California, 94065<br><br>          Plaintiffs,<br><br>   v.<br><br>TEILHARD TECHNOLOGIES, SHOPPLEX.COM CORPORATION, JUXTACOMM TECHNOLOGIES, INC., and SECURE GROUP, INC.<br><br>Suite 217, 11625 Elbow Drive SW, Calgary, Alberta, Canada, T2W1G8<br><br>          Defendants. | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiffs Oracle Corporation ("Oracle Corp."), Oracle USA Inc. ("Oracle USA") and Oracle International Corporation ("Oracle International") (collectively "Oracle"), by and through their attorneys, allege as follows:

1.  This is a civil action arising under the Patent Laws of the United States, 35 U.S.C. §§101, *et seq.*, seeking declaratory judgment that United States Patent No. 6,195,662 is invalid and not infringed by Oracle, based upon the laws authorizing actions for declaratory judgment in the courts of the United States, 28 U.S.C. §§ 2201 and 2202.

**PARTIES**

2.      Oracle Corp. is a corporation organized under the laws of the State of Delaware.  Oracle Corp. maintains its principal place of business at 500 Oracle Parkway, Redwood City, California, 94065, and does business in the District of Columbia.

3.      Oracle USA is a corporation organized under the laws of the State of Colorado.  Oracle USA maintains its principal place of business at 500 Oracle Parkway, Redwood City, California, 94065, and does business in the District of Columbia.

4.      Oracle International is a corporation organized under the laws of the State of California.  Oracle International maintains its principal place of business at 500 Oracle Parkway, Redwood City, California, 94065, and does business in the District of Columbia.

5.      According to Defendants, Shopplex.com Corporation ("Shopplex") is a Canadian corporation organized and existing under the laws of Alberta, Canada, and headquartered at Suite 217, 11625 Elbow Drive SW, Calgary, Alberta, T2W1G8.

6.      According to Defendants, Juxtacomm Technologies, Inc. ("Juxtacomm") is a Canadian corporation organized and existing under the laws of Ontario, Canada, and is a subsidiary of Shopplex.  On information and belief, Juxtacomm is headquartered at 38 Auriga Drive, Ottawa, Ontario, K2E 8A5.

2

7.     According to Defendants, Teilhard Technologies Inc. ("Teilhard") is a fictitious business trade name of Shopplex or, according to Teilhard's website (www.teilhardtech.com/WhitepaperRequest/), a Canadian corporation headquartered at Suite 217, 11625 Elbow Drive SW, Calgary, Alberta, T2W1G8.

8.     According to Defendants, Secure Group Inc. ("Secure Group") was a Canadian corporation based in Alberta, Canada, that sold "certain assets, including intellectual property" and the "Secure Group" trade name to Teilhard in October, 2005. Defendants claim that Secure Group "no longer exists as a separate entity, although "Secure Group" is an entity identified as "A Teilhard Technologies Company" on Defendants' website (www.securegroup.ca/Services/NetworkInventory).

## NATURE OF THIS ACTION AND PROCEDURAL BACKGROUND

9.     Oracle seeks a declaratory judgment that Oracle software does not infringe U.S. Patent No. 6,195,662 (the "'662 patent"), Exh. A, which defendant JuxtaComm Technologies, Inc. claims to own. Oracle also seeks a declaratory judgment that the '662 patent is invalid and/or unenforceable.

10.     The present action mirrors an earlier-filed declaratory judgment suit brought by Oracle in the United States District Court for the Northern District of California on April 27, 2006: *Oracle Corporation, Oracle USA Inc., and Oracle International Corporation v. Teilhard Technologies, Shopplex.com Corporation, Juxtacomm Technologies, Inc., and Secure Group, Inc.*, Case No. C 06 2889 SI (Judge Susan Illston) (the "California Action"). The parties are identical as is the patent-in-suit.

11.    On August 11, 2006, Teilhard moved to dismiss the California action, contending that the court lacked subject matter jurisdiction because Oracle's apprehension of suit was unreasonable and contending that the court lacked personal jurisdiction over Defendants because Defendants allegedly did not have sufficient contacts with the State of California. Oracle opposed Teilhard's motion and requested jurisdictional discovery. On September 6, 2006, the court bifurcated Teilhard's motion to dismiss, ordering briefing on the subject matter jurisdiction dispute before considering the personal jurisdiction issue. The court denied Teilhard's Motion to Dismiss for lack of subject matter jurisdiction on October 2, 2006, and ordered discovery relating to the personal jurisdiction issue to proceed. *See* Exh. B (J. Illston Op.).

12.    Oracle files this action in the District of Columbia in the interest of efficiency, before taking jurisdictional discovery, and in response to Teilhard's representations that it has insufficient contacts with California to support personal jurisdiction.

## EXISTENCE OF AN ACTUAL CONTROVERSY

13.    There is an actual controversy within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202.

14.    In 2004, Teilhard began contacting several software companies, including Oracle, in an attempt to negotiate a license for the '662 patent. Teilhard engaged Mr. Divjot "Sunny" Narang to represent Teilhard in its contacts with Oracle from 2004 to 2005. Teilhard, through Mr. Narang, asserted that Oracle's software infringed the '662 patent, and that Teilhard owned the '662 patent. Teilhard created a

4

password protected web page on its website (www.teilhardtech.com/sunny/oracle), and provided the password to Oracle. Through this web page, and through direct correspondence with Oracle, Teilhard provided Oracle with a formal opinion prepared by Mr. Victor Friday stating that Oracle's software uses the "logic, methods, and processes contained in" the '662 patent. Teilhard contacted Oracle repeatedly during 2004 and early 2005, including in a telephone conversation between Roger Kennedy of Oracle, Ken Prather, the CEO of Teilhard, David Brown, the Chief Information Officer of Teilhard, and "Sunny" Narang. In an email after that telephone call, Mr. Narang stated that "ETL (Extract, Transform and Load)" functionality in Oracle products "is of course covered by the US '662 patent owned by Teilhard." Mr. Narang also stated in a further email sent to Oracle that "[w]hat Oracle has introduced into their product offerings as of Oracle 9i is what 'infringes' '662." Negotiations between Oracle and Teilhard failed when Teilhard, through Mr. Narang, requested $1 - $2 billion dollars for a license to the '662 patent.

15.    Through Mr. R.G. (Ron) Fewer, Teilhard contacted Oracle again in 2006. On April 10, 2006, Mr. Fewer sent Oracle a letter stating that Oracle was "one of several companies that are in violation of Teilhard's patent" and that Teilhard's CEO, Ken Prather, would be meeting "with a major patent trademark law firm out of Manhattan" to discuss litigation in the U.S. The letter further states that the "major patent trademark law firm out of Manhattan . . . has agreed to pursue patent defense, licensing, and or settlement issues in the US and will assume all costs in association with said litigation." Included with the letter from Mr. Fewer was a binder "provided by

Teilhard Technologies," according to the letter. In fact, Teilhard's Executive Vice President, Richard Kaye, had provided the binder for Mr. Fewer to deliver to Oracle. The binder contained instructions addressed to Mr. Fewer with information about Teilhard, business cards for Teilhard executives, a copy of the '662 patent, and an infringement analysis mapping out Teilhard's claim that Oracle's product infringed the '662 patent. Also included in the binder was a draft document related to Teilhard's patent infringement suit against DataMirror over the Canadian counterpart of the '662 patent. Notably, the infringement analysis provided in the binder delivered to Oracle by Mr. Fewer is the same analysis provided by Teilhard in 2004-2005 through its prior agent, Mr. Narang.

16.    On April 20, 2006, ten days after Mr. Fewer sent the letter and binder of information to Oracle, he sent an email to Oracle's General Counsel, stating "I learned today that legal action will begin in the U.S. on April 28th regarding patent infringement allegations against Oracle, Microsoft, and SAP." Six days later, Mr. Fewer sent an email to Oracle's Chief Patent Counsel, Roger Kennedy, referring again to the "April 28th deadline." Oracle filed suit against Teilhard on April 27, 2006.

17.    Teilhard's revived infringement charges and litigation threats are part of an overall scheme to "monetize the patent." Describing Teilhard's present patent litigation and enforcement plans, Teilhard's CEO, Ken Prather, stated: "Teilhard's strategy, begun in March of 2006, has been to try to find a [Patent Licensing and Enforcement Company] to pursue the licensing and enforcement of Teilhard's '662 patent."

18.    Based on the failed negotiations between the parties, Teilhard's communications with Oracle, its assertion that Oracle infringes the '662 patent, its assertion that it has retained legal counsel to pursue an action for patent infringement against Oracle, and Teilhard's recent pronouncement of its strategy to "monetize" the '662 patent, Teilhard has created in Oracle a reasonable apprehension that Teilhard will initiate a patent infringement suit against Oracle alleging that Oracle infringes the '662 patent.

19.    Based on these facts, the California district court found that subject matter jurisdiction of Oracle's declaratory judgment action was satisfied. After briefing and a hearing, the California district court found that Oracle had an objectively "reasonable apprehension" of suit based on the totality of the circumstances. Exh. B at 7:9-10 (J. Illston Op.). The court concluded that "Oracle had every reason to believe it would be sued for patent infringement considering these circumstances and the failed prior negotiations." *Id.* at 7:12-13. The California district court also declined to dismiss Oracle's declaratory judgment suit in its discretion, noting that Oracle and Teilhard are not negotiating and there is "no evidence supports Teilhard's claim that the action taken by Oracle was a tactical maneuver." *Id.* at 7:19-21.)

20.    Oracle denies that the '662 patent is or has been infringed by Oracle, and disputes its validity.

21.    Since Oracle's declaratory judgment suit on April 27, 2006, Teilhard's conduct and the conduct and statements of Teilhard's agents has reinforced Oracle's reasonable apprehension of an infringement suit by Teilhard in the future.

22.    Teilhard has not retracted its express charge of infringement against Oracle.

23.    Teilhard continues its efforts and strategy to "monetize the ['662] patent" by engaging a "Patent Licensing and Enforcement Company" or "PLEC" to "pursue patent enforcement strategies as appropriate."

24.    An actual and justiciable controversy exists between Oracle and Teilhard, and between Oracle and Teilhard's alter egos, as to whether the '662 patent is invalid and/or infringed. Absent a declaration of invalidity and/or noninfringement, Teilhard and/or its alter egos will continue to wrongfully assert the '662 patent against Oracle, and thereby cause Oracle irreparable injury and damage.

### PERSONAL JURISDICTION AND VENUE

25.    In its sworn and certified statements to the court in the Northern District of California, Teilhard contends that it is a foreign patentee not residing in the Unites States.

26.    Teilhard, has not designated a person residing in the United States on whom process or notice of proceedings affecting the '662 patent or rights thereunder may be served. Assuming the truth of Defendants' contentions that they are not resident in the United States, Defendants are thus subject to personal jurisdiction in the District of Columbia under 35 U.S.C. § 293.

27.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(c) and (d) because Defendants are foreign corporations subject to personal jurisdiction in this district.

## COUNT I

28.     Oracle hereby restates and realleges the allegations set forth in paragraphs 1 through 27 above and incorporates them by reference.

29.     Oracle has not infringed, and is not infringing, either directly or indirectly, contributorily or otherwise, any claim of the '662 patent.

## COUNT II

30.     Oracle hereby restates and realleges the allegations set forth in paragraphs 1 through 29 above and incorporates them by reference.

31.     The claims of the '662 patent are invalid for failure to comply with the requirements of the Patent Laws of the United States, including but not limited to the provisions of 35 U.S.C. §§ 101, 102, 103, and/or 112.

## JURY DEMAND

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Oracle prays for judgment as follows:

A.     Declaring that Oracle has not infringed and is not infringing, directly, indirectly or contributorily, any claims of the '662 patent;

B.     Declaring that each of the claims of the '662 patent is invalid;

C.     Declaring that all Defendants and each of their officers, employees, agents, alter egos, attorneys, and any persons in active concert or

participation with them be restrained and enjoined from further prosecuting or instituting any action against Oracle claiming that the '662 patent is valid, enforceable, or infringed, or from representing that Oracle's products or services, or that others' use thereof, infringe the '662 patent;

       D.    Declaring this case exceptional under 35 U.S.C. § 285 and awarding Oracle its attorneys' fees and costs in connection with this case; and

       E.    Awarding Oracle such other and further relief as the Court deems just and proper.

Dated: October 19, 2006           WEIL, GOTSHAL & MANGES LLP


By: _____
David A. Hickerson (DC Bar No. 414723)
David N. Southard (DC Bar No. 470832)
1300 Eye Street, NW, Suite 900
Washington, DC 20005
Tel: 202 682 7000
Fax: 202 857 0940


Of Counsel

Douglas E. Lumish (CA Bar No. 183863)
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: 650 802 3000
Fax: 650 802 3100

Attorneys for Plaintiffs
ORACLE CORPORATION, ORACLE
USA, INC. and ORACLE
INTERNATIONAL CORPORATION

# EXHIBIT A



US006195662B1

(12) **United States Patent**     (10) Patent No.:     **US 6,195,662 B1**
Ellis et al.                      (45) Date of Patent:      **Feb. 27, 2001**

(54) **SYSTEM FOR TRANSFORMING AND EXCHANGING DATA BETWEEN DISTRIBUTED HETEROGENEOUS COMPUTER SYSTEMS**

(75) Inventors: **Darin Ellis**, Orleans; **Michael Doyle**, Gloucester, both of (CA)

(73) Assignee: **Juxtacomm Technologies Inc.**, Gloucester (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/105,299**

(22) Filed: **Jun. 26, 1998**

**Related U.S. Application Data**

(60) Provisional application No. 60/051,052, filed on Jun. 27, 1997.

(51) Int. Cl.[7] .................................................. G06F 17/00
(52) U.S. Cl. ............................... **707/103**; 707/1; 707/2; 707/8; 707/10; 707/102
(58) Field of Search ............................. 707/1–2, 8, 10, 707/102–103

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,497,491 | * | 3/1996 | Mitchell et al. ........................ | 707/1 |
| 5,729,733 | * | 3/1998 | Sharif-Askary ......................... | 707/8 |
| 5,799,310 | * | 8/1998 | Anderson et al. ....................... | 707/100 |
| 5,970,490 | * | 10/1999 | Morgenstern .......................... | 707/10 |
| 5,988,862 | * | 11/1999 | Kacyra et al. .......................... | 705/5 |
| 6,047,291 | * | 4/2000 | Anderson et al. ................... | 707/103 |
| 6,078,925 | * | 6/2000 | Anderson et al. ...................... | 707/2 |

OTHER PUBLICATIONS

IEEE publication, "The HERMES Language for Work Session Specification" by Manolis Marazakis et al., Institute of Computer Science, FORTH, Greece, pp. 542–547, Aug. 1998.*

* cited by examiner

*Primary Examiner*—Thomas G. Black
*Assistant Examiner*—Diane D. Mizrahi
(74) *Attorney, Agent, or Firm*—Hardaway/Mann IP Group Nexsen Pruet Jacobs & Pollard, LLP

(57) **ABSTRACT**

A system and method is described for importing data from a source computer system, manipulating and transforming of that data, and exporting the data to a target computer system under control of a script processor using stored metadata definitions. Metadata is used to describe the properties of the data being manipulated. The system includes a means for manipulating the metadata definitions. The metadata definitions are created to import data into the system, export data from the system, create views of the external data, store generic format data within the system, manipulate generic format data within the system and to control data flow through the system. Data is imported into the system using an import data definition to map the external data into an import data bag. Data imported into an import data bag becomes independent of the original data source. Data is manipulated within the system using script control commands and data is transformed within the system using rule sets that act upon data bags. Data is exported from the system using an export data definition to map the import data bag into the required export data bag format and then to write data in the export data bag to the external data target.

**19 Claims, 12 Drawing Sheets**





FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



FIGURE 8

```
IF IN.CITY = "OTTAWA"
        OUT.NAME = APPEND( IN.FIRST_NAME, " ", IN.LAST_NAME )
        OUT.ADDR = IN.ADDR
        OUT.CITY = IN.CITY
        OUT.AGE = IN.AGE
END IF
```

FIGURE 9

ODBC database : ADDRESS.MDB    101

| FIRST_NAME | LAST_NAME | ADDRESS | CITY | COUNTRY | AGE |
|---|---|---|---|---|---|
| Bob | Drake | 10 Penny St. | Toronto | CA | 29 |
| Susan | Hellman | 55 Birch Rd. | Ottawa | CA | 35 |
| John | Bull | 101 Pullman Ave. | New York | US | 23 |
| Josef | Karsch | 31 Rideau St. | Ottawa | CA | 85 |

<u>FIGURE 10</u>

Data Bag : MAILING_DBAG    111

### DATA DEFINITION COLLECTION    <u>112</u>

| KEY | ITEM NAME | ITEM TYPE | PARENT | MAX. OCCURS | ITEM COUNTER | LEVEL |
|---|---|---|---|---|---|---|
| FIRST_NAME | FIRST_NAME | | | 1 | | 1 |
| LAST_NAME | LAST_NAME | | | 1 | | 1 |
| ADDRESS | ADDRESS | | | 1 | | 1 |
| CITY | CITY | | | 1 | | 1 |
| COUNTRY | PROV | | | 1 | | 1 |
| AGE | AGE | | | 1 | | 1 |

### DATA GROUP COLLECTION    <u>113</u>

| KEY | VALUE | KEY | VALUE | KEY | VALUE | KEY | VALUE |
|---|---|---|---|---|---|---|---|
| FIRST_NAME | Bob | FIRST_NAME | Susan | FIRST_NAME | John | FIRST_NAME | Josef |
| LAST_NAME | Drake | LAST_NAME | Hellman | LAST_NAME | Bull | LAST_NAME | Karsch |
| ADDRESS | 10 Penny St. | ADDRESS | 55 Birch Rd. | ADDRESS | 101 Pullman Ave | ADDRESS | 31 Rideau St. |
| CITY | Toronto | CITY | Ottawa | CITY | New York | CITY | Ottawa |
| COUNTRY | CA | COUNTRY | CA | COUNTRY | US | COUNTRY | CA |
| AGE | 29 | AGE | 35 | AGE | 23 | AGE | 85 |

<u>FIGURE 11</u>

Data Bag : CITY_DBAG          121

### DATA DEFINITION COLLECTION          122

| KEY | ITEM NAME | ITEM TYPE | PARENT | MAX. OCCURS | ITEM COUNTER | LEVEL |
|---|---|---|---|---|---|---|
| NAME | NAME | TEXT | | 1 | | 1 |
| ADDRESS | ADDRESS | TEXT | | 1 | | 1 |
| CITY | CITY | TEXT | | 1 | | 1 |
| AGE | AGE | INTEGER | | 1 | | 1 |

### DATA GROUP COLLECTION          113

| KEY | VALUE | KEY | VALUE |
|---|---|---|---|
| FIRST_NAME | Susan | FIRST_NAME | Josef |
| LAST_NAME | Hellman | LAST_NAME | Karsch |
| ADDRESS | 55 Birch Rd. | ADDRESS | 31 Rideau St. |
| CITY | Ottawa | CITY | Ottawa |
| COUNTRY | CA | COUNTRY | CA |
| AGE | 35 | AGE | 85 |

FIGURE 12

Delimited Flat File : OTTAWA.CSV          131



| Susan Hellman,55 Birch Rd,Ottawa,35 |
|---|
| Josef Karsch,31 Rideau St,Ottawa,85 |

FIGURE 13

| | |
|---|---|
| FIRST_NAME | CHAR(30) |
| LAST_NAME | CHAR(30) |
| ADDR_LINE1 | CHAR(30) |
| ADDR_LINE2 | CHAR(30) |
| CITY | CHAR(30) |
| PROV | CHAR(30) |
| NBR_CHILDREN | INTEGER(3) |
| CHILDREN | OCCURS 1 TO 10 TIMES |
|     CHILD_NAME |     CHAR(30) |
|     CHILD_AGE |     INTEGER(3) |

**FIGURE 14**

Repeating Data File : REPEAT.TXT    151

| Henry | Smith | 61 Falldown Rd. | RR1 | Greely | Ont | 3 | Amy | 16 | John | 13 | Bob | 23 |
| John | Kierstead | 1034 Ayr Place | Apt. 132 | Ottawa | Ont | 1 | Susan | 10 | | | | |

**FIGURE 15**

**U.S. Patent**     Feb. 27, 2001     Sheet 11 of 12     US 6,195,662 B1

Data Bag : REPEATING_DBAG     161

### DATA DEFINITION COLLECTION    162

| KEY | ITEM NAME | ITEM TYPE | PARENT | MAX. OCCURS | ITEM COUNTER | LEVEL |
|-----|-----------|-----------|--------|-------------|--------------|-------|
| FIRST_NAME | FIRST_NAME | TEXT | | 1 | | 1 |
| LAST_NAME | LAST_NAME | TEXT | | 1 | | 1 |
| ADDR_LINE1 | ADDR_LINE1 | TEXT | | 1 | | 1 |
| ADDR_LINE2 | ADDR_LINE2 | TEXT | | 1 | | 1 |
| CITY | CITY | TEXT | | 1 | | 1 |
| PROV | PROV | TEXT | | 1 | | 1 |
| NBR_CHILDREN | NBR_CHILDREN | INTEGER | | 1 | | 1 |
| CHILDREN | CHILDREN | GROUP | | 1 | | 1 |
| CHILDREN[*].CHILD_NAME | CHILD_NAME | TEXT | CHILDREN | 10 | NBR_CHILDREN | 2 |
| CHILDREN[*].CHILD_AGE | CHILD_AGE | INTEGER | CHILDREN | 10 | NBR_CHILDREN | 2 |

### DATA GROUP COLLECTION    163

| FIRST_NAME | Henry | FIRST_NAME | John |
|------------|-------|------------|------|
| LAST_NAME | Smith | LAST_NAME | Keirstead |
| ADDR_LINE1 | 61 Falldown Rd. | ADDR_LINE1 | 1034 Ayr Place |
| ADDR_LINE2 | RR1 | ADDR_LINE2 | Apt. 132 |
| CITY | Greely | CITY | Ottawa |
| PROV | Ont | PROV | Ont |
| NBR_CHILDREN | 3 | NBR_CHILDREN | 1 |
| CHILDREN[1].CHILD_NAME | Amy | CHILDREN[1].CHILD_NAME | Susan |
| CHILDREN[1].CHILD_AGE | 16 | CHILDRE[1].CHILD_AGE | 10 |
| CHILDREN[2].CHILD_NAME | John | | |
| CHILDREN[2].CHILD_AGE | 13 | | |
| CHILDREN[3].CHILD_NAME | Bob | | |
| CHILDREN[3].CHILD_AGE | 23 | | |

FIGURE 16

```
FOR CHILD_NDX = 1 TO NBR_CHILDREN
        IF CHILDREN[ CHILD_NDX ].CHILD_AGE < 20
                OUT.PARENT = APPEND( IN.FIRST_NAME, " ", IN.FIRST_NAME )
                OUT.CHILD_NAME = IN.CHILDREN[ CHILD_NDX ].CHILD_NAME
                OUT.CHILD_AGE = IN.CHILDREN[ CHILD_NDX ].CHILD_AGE
        END IF
END FOR
```

FIGURE 17

US 6,195,662 B1

1

# SYSTEM FOR TRANSFORMING AND EXCHANGING DATA BETWEEN DISTRIBUTED HETEROGENEOUS COMPUTER SYSTEMS

## RELATED APPLICATIONS

This invention claims the benefit of priority under Title 35 USC §119(e) of provisional application for patent Ser. No. 60/051,052, filed Jun. 27, 1997.

## FIELD OF THE INVENTION

This invention relates to a system and method for importing, transforming and exporting data between distributed heterogeneous computer systems and in particular to a system of script processing utilizing metadata to control data transformation within the system and data movement into and out of the system.

## BACKGROUND OF THE INVENTION

Data exchange between distributed heterogeneous computer systems has been problematic in the industry. Businesses frequently use disparate data formats and data storage types within a corporate structure. As well, business partners almost invariably use different data formats. To permit data exchange when different formats are used, a static inter-communication facility must be maintained for each pair of disparate data formats and/or data storage types. Changes to data formats or data storage types force the re-engineering of the corresponding facility.

A data import/export system is taught in U.S. Pat. No. 5,497,491 which issued on Mar. 5, 1996 to Mitchell et al. That patent describes a system and method for importing and exporting data between an external object oriented computing environment. The system and method requires a datalist object for each field to be moved from the external object oriented computing environment to the external computing environment. A metadata object is required for each datalist object. The system is therefore complex and resource-use intensive. Furthermore, it is only capable of moving data from an object-oriented to some other computer environment. The system is therefore inflexible and unsuitable for use in many applications where import/export must be performed between two computer systems that do not use object oriented data formats.

Therefore, what is needed is a distributed system and method that is capable of transforming data from a source computer system into data usable by a computer system which stores data in a different format. This system must provide a simple means for specifying the transformation definitions and for controlling the flow of data from an input data source to an output data target. Configuration management of the system must be dynamic to respond to the changing business environment and non-intrusive to minimize the effects of changing data formats or data storage types.

## SUMMARY OF THE INVENTION

It is therefore an object of this invention to provide a system and method for data transformation and data exchange between distributed heterogeneous computer systems.

It is another object of the present invention to provide a script processing language that defines operations to control data transformation within the system and data movement into and out of the distributed system, utilizing metadata definitions.

2

It is another object of the present invention to provide a format control language that defines the transformation of an external data source into data bags and of the internal data bags to an external data target.

It is another object of the present invention to provide a means of configuration management that allows a user of the system to define scripts, import data connections, export data connections, data bags, and rule set definitions and to store them in a metadata database.

It is another object of the present invention to provide a means of executing scripts in order to control the distributed transformation system.

According to the invention, there is provided a system for transforming and exchanging datastore data between heterogeneous computer systems using different datastore formats for storing similar information, the system comprising: means for transforming and processing import datastore data into generic format data according to predetermined import transformation rules and functions; means for converting the generic format data into export datastore data according to predetermined export transformation rules and functions; and interface to communications means for receiving the import datastore data and for transmitting the export datastore data.

A datastore refers to the storing of any type of data in a persistent storage system, such as on magnetic media like a disk drive. The types of data stored could include text or binary.

As will be shown below, the present invention can be used to create import data definitions, data bag storage, data bag transformation definitions or rule sets, export data definitions and scripts to control the usage of all those definitions in the process of transforming and exchanging data between dissimilar computer systems.

A generic format data bag contains both the data to be manipulated and the data structure definitions, in a generic format. The present invention will use the title 'data bag' to indicate a generic format data bag.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a block diagram of a data transformation and exchange environment, an external distributed computing environment and the associated hardware platforms.

FIG. 2 shows a block diagram of a system for transforming and exchanging data between heterogeneous distributed computing environments according to the present invention.

FIG. 3 shows the components of the present invention that are defined within the metadata database.

FIG. 4 shows the operations performed by the import data interface 32 and the export data interface 34 when the script processor 37 of FIG. 2 is invoked.

FIG. 5 is a flow diagram showing operations performed by the configuration management user interface 39 of FIG. 2 at program execution time.

FIG. 6 is a flow diagram showing operations performed by the script processor 37 of FIG. 2.

FIG. 7 shows an example of the operations to define the components for a data transformation.

FIG. 8 shows an example script to control the data transformation defined in FIG. 7.

FIG. 9 shows an example of part of a rule that could be used in the data transformation defined in FIG. 7.

FIG. 10 shows the internal storage of an example ODBC-enabled database table used in the data transformation defined in FIG. 7.

US 6,195,662 B1

3

FIG. 11 shows the internal storage of the data bag used to store the imported data defined and used in the data transformation defined in FIG. 7.

FIG. 12 shows the internal storage of the data bag used to store the data for export that is defined and used in the data transformation defined in FIG. 7.

FIG. 13 shows the internal storage of the export data target used in the data transformation defined in FIG. 7.

FIG. 14 shows the data layout, such as might appear in a computer program, of a text file containing personal information records. There is a repeating group of information at the end of each record. This data layout example will be used to show how data bags can handle repeating groups of data.

FIG. 15 shows the text file, defined in FIG. 14, with some example data.

FIG. 16 shows a data bag containing the data from the text file defined in FIG. 15. The data group definition 162 shows how the 'CHILDREN' group is defined and the data group collection 163 shows how the 'CHILDREN' group is stored.

FIG. 17 shows an example rule that would act on the data bag defined in FIG. 16 and output only the personal records that contained children whose age is less than 20.

## DETAILED DESCRIPTION OF THE INVENTION

Prior to describing a system and method for data transformation and data exchange between distributed heterogeneous computer systems according to the present invention, a general overview of the computing environment will be provided. A general description of the system and method of the present invention will then be provided, followed by a detailed design description for the system and method for data transformation and data exchange according to the present invention.

Referring to FIG. 1 and FIG. 2, the hardware and software environment in which the present invention operates will now be described. The present invention is a method and system for data transformation and data exchange between an external distributed computing environment 12 operating on one or more computer platforms 11 and a transformation/exchange system 13 operating on one or more computer platforms 14. It will be understood by those having skill in the art that each computer platforms 11 and 14 typically include computer hardware units such as main memory 17, a central processing unit (CPU) 18 and an input/output (I/O) interface 19, and may include peripheral components such as a display terminal 21, an input device such as a keyboard 22 or a mouse 23, nonvolatile data storage devices 24 such as magnetic or optical disks and other peripheral devices. Computer platform 11 or 14 also typically includes micro-instruction code 16, and an operating system 15. As one example, each computer platform 11 and 14 may be a desktop computer having an IBM PC architecture. Operating system 15 may be a Microsoft Windows NT operating system. FIG. 2 is a functional block diagram of the current invention. It will be understood by those having skill in the art that this architecture might be implemented on multiple machines and will vary according to the application.

Referring to FIG. 1, a system 13 for transformation and exchange between distributed heterogeneous computer systems 12, according to the present invention, is shown. As shown in FIG. 2, the transformation and exchange system 13 includes an import data interface 32 to import data from an import data source 31 into the transformation and exchange system 13. As shown in FIG. 4, the import data interface 32

4

includes an import data connection 41, an import data view 42 of the import data source 31 and a generic format data bag 43 where the imported data is to be stored. Those skilled in the art will understand that a view is a logical subset of the content of an actual external data source. The import data view 42 is a logical subset of the content of the import data source 31. As will be shown below, the import data view 42 will be used during the execution of the script processor 37 (FIG. 2) to load data from the import data source 31 into the data bag 43.

Data bags 43 are used in the present invention for the storage and transformation of external data. A data bag contains both the definition of the data contained within the data bag and the actual generic format data. Generic format data refers to data that has been stored within the present invention and is now independent of the original data source. Data stored in this generic format can be transformed into any required format for exporting to an export data target 33 (FIG. 2). Data bags are stored in non-persistent storage, like main memory 17, are created by the script processor and exist while the script is running. Data bags can contain fixed format data, data grouping and repeating data groups.

Referring again to FIG. 2, the system includes an export data interface 34 to export a data bag 44 out to an export data target 33. As shown in FIG. 4, the export data interface 34 includes generic format data bag 44 where data for exporting is stored, the export data view 45 of the data bag 44 and the export data connection 46. As will be shown below, the export data view 45 of the data bag 44 will be used during the execution of the script processor 37 to save data from the data bag 44 out to the export data target 33.

Also shown in FIG. 2 and FIG. 3, the system includes a configuration management user interface 39 to define the components of the present invention, which include external data connections 51, views 52, data bags 53, rule sets 54 and scripts 55. These component definitions are stored in the metadata database 38. The data bags are stored in the internal datastore 35. The component definitions will be described in detail below.

The transformation and exchange system 13 includes a script processor 37, in order to run scripts 55 defined in the metadata database 38. The script processor 37 identifies the script command and invokes the correct method for that script command. The transformation/exchange system 13 also contains a rule processor 36 that is invoked by the script processor 37 to transform one data bag into another data bag based on a rule. Rules will be described below.

FIG. 5 is a flow diagram showing the components that can be defined using the configuration management user interface 39 and the actions taken when defining each component.

Connections 51 must have their connection type and properties defined. The connection type will be any of the industry standard data storage types, such as ODBC-enabled databases, spreadsheets, message-oriented middleware and text files. The properties will include the name and location of the external data storage.

Views 52 must be associated with either an import data connection 41 (FIG. 4) or an export data connection 46. Each data connection has one or more views of the external data. These views are used to import different collections of data from an import data source 31 (FIG. 2), or to export different collections of data from an export data bag 44 out to an export data target 33.

Data bag definition 53 contain two types of data collection: a data definition collection and a data group collection.

US 6,195,662 B1

5

A collection is a logical grouping of records that use the same format method. All the element definitions for a data bag are stored within the data definition collection. Each row of data in a data bag is stored as one data group in the data group collection. The data group collection contains all the data groups in the data bag. An import data connection 41 must have one or more import data views 42 and each data view must have an associated import data bag 43. Using the data definitions in the data definition collection 112 (FIG. 11) of a data bag, the import data view 42 of the import data connection 41 is loaded in the import data bag 43. An export data connection 46 must have one or more export data views 45 and each data view must have an associated export data bag 44. Using the data definitions in the data definition 112 of a data bag, the export data view 45 of the export data connection 46 is written using the data contained in the data bag. Data bags are also defined for use by script commands that require import and export data bag(s), where these commands transform the data from the import data bag 43 and place the results in the export data bag 44.

Rule sets 54 (FIG. 5) are collections of rules within the present invention. Rule sets are used to transform a data bag in one format into another data bag of a different format. The purpose of a rule is to perform a specific operation to achieve a desired result. A rule is one or more statements. These statements are executed from top to bottom and when the last statement within the rule has been executed, or an Exit statement is encountered, the rule ends.

A statement is a single line in a rule. The types of statements implemented by the present invention, within the rule set processor, includes comments, conditional processing, exiting a rule, looping, variable declaration and variable assignment.

Conditional processing, looping and assignment statements contain expressions. Elementary expressions include strings, numbers, content of a variable and return value of a function. Functions are categorized into character manipulation, string manipulation, including other rules, initialization information, external file manipulation, variable content reporting and user interface.

Complex expressions combine many elementary expressions in some manner, for the purpose of producing a single result. Complex expressions can be either arithmetic or conditional.

. Complex arithmetic expressions are numeric elementary expressions that are combined to produce a single arithmetic result. Such expressions follow the standard format of all numeric expressions. Numbers are acted upon by numeric operators such as addition, subtraction, multiplication, division, modulo and exponential. Brackets are used to group numbers and operators which need to be evaluated together.

Conditional expressions return the value True or False. These types of expressions are used to control conditional processing within the rules. Brackets are used to group conditions which need to be evaluated together. Complex conditional expressions are formed by combining simple conditions with 'And' or 'Or' operators.

Simple conditions have a 'left side' 'operator' 'right side' format. The left and right sides are elementary expressions. The logical operators that can be used for these conditions are equals, greater, less, not equal, greater or equal, less or equal, 'like' and 'in'. A simple condition can be negated by using the word 'not' in front of the condition.

Scripts 55 must be defined to control data movement into and out of the system, and to control data transformation within the system.

6

FIG. 6 is a flow diagram showing the actions taken by the script processor 37 of the present invention.

The LOAD command permits an import data view 42 to be used to load data from an import data source 31 into an import data bag 43. The import data view 42 is associated with an import data connection 41, which specifies the import data source 31.

The SAVE command permits an export data view 45 to be used to save data from an export data bag 44 out to an external data target 33. The export data view 45 is associated with an export data connection 46, which specifies the external data target 33.

The MERGE command permits two or more specified data bags, of the same data bag type, to be merged into another data bag. Only non-duplicate data groups from the input data bags are merged into the output data bag.

The JOIN command permits two or more specified data bags to be joined together into another data bag, dependent on the matching of a specific key value.

The APPEND command permits one data bag to be appended to the end of another data bag of the same data bag type.

The COPY command permits one data bag to be copied to another specified data bag of the same data bag type. If the target data bag exists, it will be overwritten.

The FORMAT command permits the transformation of a specified data bag into another data bag, possibly of a different data bag type, using a specified rule. This command will invoke the rule processor 36 to take the input data bag, transform the data according to the rule statements and populate the output data bag with the transformed data.

The SORT command permits a data bag to be sorted by one or more data elements within the data bag. Each element can have an ascending or descending sort applied to it. The result can be placed back into the original data bag or the result can be written to another data bag of the same type.

An example of a transformation according to a preferred embodiment of the invention will be shown in the following description. The embodiment will describe the definition and usage of an import data connection, export data connection and transformation requirements to convert an Open Database Connectivity (ODBC) enabled database table into a delimited flat file. This example was chosen because of the widespread usage of both ODBC and delimited files in the business community and of the direct application of the invention to the problem of transforming data between these two standards used by heterogeneous computer systems.

FIG. 7 shows the steps taken by the user to set up the definitions required for the preferred embodiment and to initiate the script to carry out the transformation from ODBC database data to delimited data. The user will invoke the configuration management user interface 39 (FIG. 2) to create the required definitions.

As shown in step 72, the user defines the import data connection 41 with a connection type of ODBC-enabled database, defines the location of the import data source 31 and defines the table within the database to be used as the data source. In step 73 the user defines the import data bag to hold the data imported from the import data connection 41.In step 74 the import data view 42 is created to define the fields within the import database table that are to be used when processing the data source. The import data view 42 is associated with the import data bag 43 that will receive the incoming data.

In step 75, the export data connection 46 is defined with a connection type as file and the location of the target data

US 6,195,662 B1

**7**

file is defined. In step 76, the user defines the export data bag that will hold the data to be used by the export data connection 46. In step 77 the export data view 45 is created to define the layout of the target data file. The export data view 45 is associated with the export data bag 44 that will be used to send data to the external data target 33.

In step 78, the rule definition allows the user to specify a complex set of statements to control the transformation of one data bag to another data bag. The statements in the rule come from the format control language which includes conditional logic flow control, looping and the ability to define and call functions not defined within the language.

In step 79, the user then defines the script that will load the import data source 31 into an import data bag 43, transform the loaded import data bag 43 into an export data bag 44 by executing the rule processor 36 using the specified rule (Rule1), and then exports the export data bag 44 to the external data target 33.

Finally, in step 80, the user initiates the script processor 37 to execute the script. The script processor 37 can be initiated from the graphical interface or from an interface external to the system.

FIG. 8 shows the script defined for this example. The first script command 81 uses the import data connection 41 and import data view 42 to load the data from the import data source 31 into the import data bag 43. The second command 82 transforms the data bag 43 into an export data bag 44 using the specified rule set (RuleSet1). Once the export data bag 44 has been populated with the transformed data it can be saved 83 directly out to the export data target 33, using the export data view 45 and the export data connection 46.

FIG. 9 shows an example rule for this example. The example rule demonstrates the use of conditional flow control (IF statement), record selection based on incoming data content (IN.CITY="OTTAWA") and data transformation using assignment statements (for example, OUT.NAME=APPEND(IN.FIRST_ NAME, "", IN.LAST_ NAME)). In step 78 of FIG. 7, RuleSet1 is defined to contain one rule (Rule1) which transforms data bag MAILING_ DBAG into data bag CITY_DBAG. When Rule1 is executed in the example shown in FIG. 9, the import data bag refers to MAILING_DBAG and the export data bag refers to CITY_DBAG.

FIG. 10 shows an example import data source 31 for this example. The internal storage of an ODBC-enabled database table is shown. The data in this table will be used to illustrate the data transformation defined in FIG. 7. The import data connection 41, defined in step 72, refers to the exact location of the database file ADDRESS.MDB 101 and indicates that the database is ODBC-enabled. The import data view 42, defined in step 74, specifies that all the fields in the data source table will be imported into the import data bag 43, defined in step 73.

FIG. 11 shows the internal storage of the import data bag 43, defined in step 73, which is used in the data transformation in FIG. 7. The data definition collection 112 specifies the key name used for locating fields in the data group collection 113 and specifies the data type for a field value associated with each key. All the fields in the data source table have been imported into the MAILING_DBAG data bag 111. This import data bag is created by the LOAD script command in step 81, (FIG. 8) using metadata definitions from the metadata database 38.

FIG. 12 shows the internal storage of the export data bag 44, defined in step 76, which is used in the data transformation described with reference to FIG. 7. The data group

**8**

definition 122 is different than the data group definition 112 shown in FIG. 11. The CITY_DBAG data bag 121 contains three of the original six fields from the MAILING_DBAG, the import 111 data bag, as well as a computed field that is a concatenation of the first and last names from the import data bag. The CITY_DBAG 12 export data bag is created by FORMAT script command in step 82, using metadata definitions from the metadata database 38 (FIG. 2). FIG. 9 shows part of Rule1, which is contained in RuleSet1 and defined in step 78. The rule set in this example filters out all data group collection records in the MAILING_DBAG import data bag that have a city name of 'OTTAWA' and then writes those records into the CITY_DBAG export data bag.

FIG. 13 shows the internal storage of the export data target 33 for this example. The internal storage of a delimited flat file is shown. The export data connection 46, defined in block 75, refers to the exact location of the flat file CITY.CSV and indicates that the file is delimited. The export data view 45, defined in step 77, specifies that all the fields in the data bag will be exported to the delimited flat file 131, defined in step 73. The CITY.CSV flat file is created by the SAVE script command in step 83, using metadata definitions from the metadata database 38.

FIG. 14 shows a second import data example. The storage format of a personal information text file is shown. Each record contains a group at the end of the record, with repeating information about children of the specified person. This file definition will be used to illustrate the data storage of repeating group information in a data bag and the rule processing of the repeating group information during a data bag transformation. This file definition will be used to create the import data interface 32 used in this example.

FIG. 15 shows the internal storage of the text file defined in FIG. 14. Each record contains a common set of fields before the 'CHILDREN' group. At the end of each record the 'CHILDREN' group may contain from zero to ten sets of 'child' information, consisting of the child's name and age. Each record is terminated by an end-of-record indicator appropriate to the computer system on which the file resides.

FIG. 16 shows the internal storage of the import data bag 43, that contains the imported data of the text file shown in FIG. 15. The data definition collection 162 now shows an example of a 'group' item type. The 'CHILDREN' group is defined as containing two fields, as specified by the two entries following the 'CHILDREN' group entry. The data group collection 163 shows how each record from the import text file, shown in FIG. 15, is stored. The number of occurrences of the data group, defined by 'NBR_ CHILDREN', must be stored so that the correct number of sets of the 'CHILDREN' group can be processed when manipulating the import data bag.

FIG. 17 shows an example rule created to transform the REPEATING_DBAG import data bag defined in FIG. 16. This rule is one rule of a rule set. This rule will output the parent name, child name and child age for each input child whose age is less than 20. This example shows how a repeating information group can be manipulated within a data bag.

In the drawings and specification, there have been disclosed typical examples of the use of a preferred embodiment of the invention. Although specific terms have been employed to describe the preferred embodiment, they are used in a generic and descriptive manner only and not for purposes of limitation. The scope of the invention is set forth in the following claims.

*script initiated from gui*

US 6,195,662 B1

9

10

We claim:

1. A distribution system for transforming and exchanging data between heterogeneous computer systems, comprising:
   a) a systems interface for defining logical import and export data interfaces, data transformation rule sets and scripts;
   b) a metadata database for storing said logical import and export data interfaces, data transformation rule sets and scripts;
   c) a script processor for utilizing metadata from the metadata database to control data transformation within said systems interface and movement of said data into and out of said distribution system; and
   d) a rule set processor responsive to said script processor for manipulating a data bag for storing imported data and a data bag for storing export data.

2. A distribution system as claimed in claim 1, wherein said systems interface comprises a configuration management user interface used by a user to define said logical import and export data interfaces, and create data transformation rule sets and scripts.

3. A distribution system as claimed in claim 2, wherein said logical import and export data interfaces comprise import and export data connections, import and export data views and said import and export data bags.

4. A distribution system as claimed in claim 3, wherein said logical data interface is used to import data from an import data source into said distribution system.

5. A distribution system as claimed in claim 4, wherein said import data view is used during execution of said script processor to load data from said import data source into said import data bag.

6. A distribution system as claimed in claim 3, wherein said logical export data interface is used to export data in said data bag out to an export data target.

7. A distribution system as claimed in claim 6, wherein export data view of said export data bag is used during execution of said script processor to save data from said export data bag out to said export data target.

8. A distribution system as claimed in claim 1, wherein defined scripts stored in said metadata database are executed by said script processor.

9. A distribution system as claimed in claim 1, wherein said rule processor is invoked by said script processor to transform the import data bag into the export data bag based on predefined data transformation rules.

10. A distribution system as claimed in claim 1 wherein said script processor makes use of a script control language for controlling data transformation within said system interface and movement of said data into and out of said distribution system.

11. A distribution system as claimed in claim 10, wherein said script control language comprises a set of script commands and a script command processor to process and execute each of a number of script command lines.

12. A distribution system as claimed in claim 11, wherein said set of script commands comprises a load command to load data into an import data bag from an import data connection; a sort command for sorting data in a data bag into a different order; a merge command for merging together the data in a number of data bags; an append command for appending data from one data bag into another data bag; a copy command for copying one data bag into another data bag; a join command for joining two or more data bags into another data bag; a format command for formatting a data bag into another data bag using a defined rule set; and a save command for saving data from an export data bag out to an export data connection.

13. In a distribution system for transforming and exchanging data between heterogeneous computer systems, a method of controlling data transformation within said distribution system, comprising the steps of:
   a) operating a script processor that utilizes metadata stored in a metadata database to control the loading of data into an import data bag from a logical import data interface and performing any one or more of the following steps to convert the data to a desired format in an export data bag;
      1) sorting said data according to a predetermined order;
      2) merging data from a number of data bags into one data bag;
      3) appending data from a first data bag into another data bag of the same type;
      4) copying data from a first data bag into another data bag of the same type;
      5) joining data from two or more data bags into another data bag using a specified key;
      6) formatting data from a data bag into another data bag of a different type, using a defined rule set; and
   b) saving the data in the export data bag out to an export data connection.

14. A method as claimed in claim 13 wherein said logical import data interface comprises import data connections, import data views and said import data bag.

15. A method as claimed in claim 14 wherein said logical import data interface is used to import data from an import data source into said distribution system.

16. A method as claimed in claim 15 wherein said import data view is used during execution of a script processor to load data from said import data source into said import data bag.

17. A computer readable memory for transforming and exchanging datastore data between heterogeneous computer systems using different datastore formats for storing similar information, comprising:
   a) executable code for providing a systems interface for defining logical import and export data interfaces, data transformation rule sets and scripts;
   b) executable code for providing a script processor for utilizing metadata from a metadata database to control data transformation within said systems interface and movement of said data into and out of said distribution system; and
   c) executable code for providing a rule set processor responsive to said script processor for manipulating a data bag for storing imported data and a data bag for storing export data.

18. A computer readable memory as claimed in claim 17 wherein the metadata database stores logical import and export data interfaces, data transformation rule sets and scripts executed by the script processor.

19. A computer readable memory as claimed in claim 17 further comprising a script control language used by the script processor to control data transformation within said system interface and movement of said data into and out of said distribution system.

* * * * *

# EXHIBIT B

1
2
3
4
5                 IN THE UNITED STATES DISTRICT COURT
6            FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8 ORACLE CORPORATION, et al.,        No. C 06-02889 SI
9          Plaintiffs,        **ORDER DENYING DEFENDANTS'**
                                 **MOTION TO DISMISS**
10    v.
11 TEILHARD TECHNOLOGIES, et al,
12          Defendants.          /
13
14      On September 29, 2006, the Court heard oral argument on defendants' motion to dismiss for
15 lack of subject matter jurisdiction. Having carefully considered the papers submitted by the parties and
16 arguments of counsel, the Court hereby DENIES defendants' motion.
17
18                      **BACKGROUND**
19      On April 27, 2006, plaintiffs Oracle Corporation, Oracle USA, Inc., and Oracle International
20 Corporation (collectively, "Oracle") filed this patent action. Oracle seeks a declaratory judgment that
21 its products do not infringe U.S. Patent No. 6,195,662 ("the '662 patent"). The '662 patent is owned by
22 defendant JuxtaComm Technologies, Inc., which has licensed it to its subsidiary, defendant
23 Shopplex.com Corporation. Both JuxtaComm and Shopplex are Canadian corporations. Shopplex does
24 business as Teilhard Technologies, which is also named as a defendant. The final named defendant,
25 Secure Group, Inc., was formerly a Canadian corporation, but, according to defendant, no longer exists.
26 In October 2005, while Secure Group, Inc. was still in existence, Teilhard purchased certain assets from
27 it, including the trade name "Secure Group."
28      Oracle filed this action after receiving an April 10, 2006 letter from Ron Fewer, who did not

**United States District Court**
For the Northern District of California

1    purport to have any official relationship with Teilhard Technologies. Fewer's letter stated that Oracle

2    was "one of several companies that [were] in violation of Teilhard's patent." Kennedy Decl., Exh. C.

3    It also stated that Teilhard's CEO, Ken Prather, would be meeting "with a major patent trademark law

4    firm out of Manhattan" to discuss litigation in the U.S. *Id.* Finally, the letter stated that "Mr. Prather

5    would welcome the opportunity to provide more information to Oracle with a view to exploring a

6    relationship with mutual benefit." *Id.* Included with the letter was a binder containing instructions

7    addressed to Fewer with information about Teilhard, a copy of business cards for executives of Teilhard,

8    a copy of the '662 patent, and an analysis of the basis for Teilhard's contention that Oracle's product

9    infringed the patent. *Id.* On April 20, 2006, ten days after Fewer sent the letter to Oracle, he sent an

10   email to Dan Cooperman, General Counsel for Oracle. Fewer's email stated that "I learned today that

11   legal action will begin in the U.S. on April 28th regarding patent infringement allegations against

12   Oracle, Microsoft, and SAP. " *Id.,* Exh. D. Fewer sent a final email to Roger Kennedy, Oracle's Chief

13   Patent Counsel, on April 26, 2006. That email again referred to the "Friday April 28th deadline" and

14   asked if Kennedy had a "timeline for contact with Teilhard." *Id.,* Exh. E.

15        This communication between Fewer and Oracle was not the first time Teilhard allegedly

16   communicated with Oracle about the '662 patent. In 2004-2005, Teilhard and Oracle attempted to

17   negotiate a license agreement through Mr. Divjot "Sunny" Narang, Teilhard's investment banker.

18   Narang  alleged that Oracle was infringing on the '662 patent and gave Oracle an analysis purporting

19   to show the alleged infringement.  The negotiations halted when Narang requested $1 - $2 billion for

20   a license.

21        Despite the fact that none of the communications from Fewer explicitly purported to be an

22   official communication from any of the defendants, Oracle filed suit against defendants on April 27,

23   2006.  The complaint asserts that Fewer's communications with Oracle "created a reasonable

24   apprehension that Teilhard will initiate a patent infringement suit against Oracle alleging that Oracle

25   infringes the '662 patent." Compl. ¶ 13.

26        On August 11, 2006, Teilhard filed a motion to dismiss, claiming that the Court lacks subject

27   matter jurisdiction over this action because Oracle's apprehension of suit was not reasonable. Teilhard

28   also claimed that the Court lacks personal jurisdiction over each defendant.

2

1    Oracle subsequently filed a motion seeking jurisdictional discovery. On September 6, 2006,

2    the Court entered an order bifurcating the motion to dismiss, such that the issue of subject matter

3    jurisdiction dispute would be resolved prior to hearing the issue of personal jurisdiction. The Court

4    denied Oracle's request for discovery on subject matter jurisdiction, but granted Oracle limited

5    discovery on personal jurisdiction to be conducted if and after the Court denied dismissal based on

6    subject matter jurisdiction.

7    Teilhard now moves to dismiss the claim based on lack of subject matter jurisdiction.

8

9    **LEGAL STANDARD**

10    A plaintiff bears the burden of establishing subject matter jurisdiction. *See Steel Co. v. Citizens*

11    *for a Better Environment*, 523 U.S. 83, 104 (1998) ("[T]he party invoking federal jurisdiction bears the

12    burden of establishing its existence.") In patent cases, Federal Circuit law applies to determinations of

13    "[w]hether an actual case or controversy exists so that a district court may entertain an action for a

14    declaratory judgment of non-infringement and/or invalidity." *Medimmune, Inc. v. Centocor*, 409 F.3d

15    1376, 1378 (Fed. Cir. 2005). Subject matter jurisdiction exists if the defendant could have brought a

16    declaratory relief action when the complaint was filed. *See Household Bank v. JFS Group*, 320 F.3d

17    1249, 1256 (11th Cir. 2003).

18    To establish subject matter jurisdiction in a declaratory judgment action, a plaintiff must show

19    "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the

20    part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which

21    would constitute infringement or concrete steps taken with the intent to conduct such activity."[1] *BP*

22    *Chemicals*, 4 F.3d at 978. The reasonableness of a party's apprehension is adjudged using an objective

23    standard. *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 887 (Fed. Cir. 1992). Additionally, "an

24    examination of the totality of the circumstances must be made to determine whether there is a

25    controversy . . . " *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 880 (Fed. Cir. 1983).

26

27    _____

28    [1] The second prong is not contested.

3

United States District Court
For the Northern District of California

**DISCUSSION**

Teilhard argues that the case should be dismissed because Oracle could not have reasonably believed that Fewer was acting on its behalf and Oracle was not otherwise under an objective "reasonable apprehension" of imminent suit.

**1.    Authority of Fewer**

As an initial matter, Teilhard argues that Oracle could not have reasonably believed that Fewer was a representative of Teilhard because appearance of "authority must be established through the acts or declarations of the principal and not the acts or declarations of the agent." *American Cas. Co. v. Krieger*, 181 F.3d 1113, 1121 (9th Cir. 1999). *American* dealt with whether an independent insurance broker could be considered the ostensible agent of an insurance company, thereby binding the insurance company to policies issued without actual authority by the independent broker. *American* has no bearing on whether the appearance of an agency relationship can create a "reasonable apprehension" of suit for the purpose of bringing an action for declaratory judgment in a patent infringement suit.

Teilhard also relies on *West Interactive Corp. v. First Date Resources, Inc.*, 972 F.2d 1295, 1297 (Fed. Cir. 1992), for the proposition that unilateral communications made by an individual with no authority to act on behalf of the patentee cannot be used to allege a reasonable apprehension of suit. However, in that case neither the plaintiff nor defendant was at the meeting that resulted in the apprehension of suit. The inventor of the patent contacted one of the plaintiff's customers and informed the customer that the plaintiff and the customer were infringing on the patent. The customer subsequently related this allegation to the plaintiff who filed suit. The court held that the fear of suit was unreasonable because the inventor was not an owner, officer, agent, or employee of the defendant and there was no direct contact between plaintiff and defendant. In the instant action, Fewer directly brought the material to Oracle and he appeared to be a representative of Teilhard.

Teilhard also argues that it was unreasonable to assume that Fewer was acting on its behalf because Fewer never claimed that he worked for Teilhard. In 2004-2005, Mr. Narang, who was Teilhard's investment banker, discussed with Oracle a possible licensing agreement. Allegedly Narang clearly identified himself as a representative of Teilhard during the negotiations. In contrast, Fewer

4

United States District Court
For the Northern District of California

1   never stated he was working for Teilhard.  Furthermore, the email communications from Fewer to

2   Oracle showed that he worked for Katz Group, a drug company, as the Director of Loss Prevention.

3        Teilhard also contends the information in the binder establishes that Fewer was not a

4   representative of Teilhard and this information was non-threatening.  The letter from Fewer to the CEO

5   of Oracle contains statements such as "I felt an obligation to bring a very important matter to your

6   personal attention," and Mr. Prather would like to explore "a relationship of mutual benefit."  Kennedy

7   Decl., Exh. C.

8        Oracle responds that it was reasonable to assume Fewer was acting on Teilhard's behalf because

9   Teilhard had used a middleman in its past negotiations for a license agreement.  Oracle claims it

10   assumed that Fewer was continuing with the negotiations where Narang left off.

11        Oracle further argues that the materials contained in the binder reasonably led it to believe that

12   the binder came from Teilhard.  The letter enclosed in the binder stated that the package was "provided

13   by Teilhard Technologies" and included an allegation of infringement: "Apparently, Oracle is one of

14   the several companies that are in violation of Teilhard's patent." Kennedy Decl., Exh. C.  It also

15   included copies of business cards of Mr. Prather and Mr. Kaye (Vice President of Shopplex.com), a set

16   of instructions to Fewer, an infringement analysis mapping out Teilhard's claim against Oracle, and a

17   draft document related to a patent infringement suit against DataMirror over the Canadian counterpart

18   of the '662 patent. *Id.* Oracle argues that it was reasonable to infer that it came from Teilhard because

19   the person who put the binder together would have to have had intimate knowledge of the company.

20   For example, the instructions in the binder to Fewer state, "within the next 10 days the company CEO

21   will be meeting with a Patent Law Enforcement Corp in New York." *Id.*  Additionally, Oracle's Chief

22   Patent Counsel concluded that the analysis in the binder mapping out Oracle's infringement on the '662

23   patent was substantively identical to the analysis Teilhard provided to Oracle in 2004 through Narang.

24

25        Given the totality of the circumstances, the Court finds that it was reasonable for Oracle to

26   conclude that Fewer was acting on Teilhard's behalf.  The binder contained information that would lead

27   a reasonable person to believe it was coming from Teilhard:  it contained virtually the same patent

28   infringement analysis that Narang once gave Oracle, business cards from Teilhard executives, and an

1    outline of Teilhard's similar case against DataMirror.  Furthermore, the cover letter from Fewer to the

2    CEO of Oracle lends strong support to the reasonableness of Oracle's assumption that Fewer was acting

3    on Teilhard's behalf.  The fact that it stated, "provided by Teilhard Technologies" and "apparently

4    Oracle is one of the several companies who is infringing on the '662 patent" would lead a reasonable

5    person to conclude Fewer was acting on Teilhard's behalf.  Additionally, the  letter's statement that

6    Fewer was contacted by Teilhard regarding the matter also supports the assumption that the binder was

7    sent by Teilhard.

8

9    **2.    Apprehension of imminent suit**

10    Teilhard argues that Oracle did not have a "reasonable apprehension" of suit because in the

11    license agreement negotiations with Narang, Teilhard consistently expressed its desire to engage in

12    amicable discussions and to enter into a license agreement.  Teilhard argues that the communications

13    through Narang were not objectively threatening, citing the case *Drew Chemical Co. v. Hercules Inc.*,

14    407 F.2d 360, 362 (2nd Cir. 1968). In *Drew Chemical* the defendant made representations that the

15    plaintiff was infringing on its patent.  Plaintiff and defendant met to discuss a possible licensing

16    agreement and the defendant began testing plaintiff's product to see if it infringed on the patent. Before

17    the test was complete, the plaintiff filed suit.  The defendant completed the test and concluded that

18    plaintiff was not violating its patent and notified plaintiff of this in writing.  However, the plaintiff

19    continued with the suit and the court held that the hints of infringement were business arguments and

20    not an actual threat to sue.  Furthermore, there was no controversy since plaintiff was not infringing on

21    the patent. In the instant action, although the prior negotiations may not have been overtly threatening,

22    Fewer clearly stated that Teilhard would file suit on April 28th and Teilhard still alleges that plaintiff

23    is infringing on its patent. Therefore, *Drew Chemical* is distinguishable.[2]

24    Teilhard also argues that even if there was a mistaken apprehension of suit in 2004-2005, any

25    apprehension was dissipated with the passage of time. *See Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d

26    _____

27    [2] Additionally, *Solenoid Devices, Inc. v. Ledex, Inc.*, 375 F.2d 444, 445 (9th Cir. 1967) is not on
     point because in *Solenoid* there was no actual threat of suit whereas here, there was an actual threat of

28    suit through Fewer's email on April 26, 2006.

6

United States District Court
For the Northern District of California

1479, 1485 (Fed. Cir. 1998).  However, although there was a passage of time between the Narang

negotiations and the filing of this suit, the binder sparked Oracle's reasonable apprehension of suit.

Oracle counters that the follow up emails by Fewer further demonstrate that it had a "reasonable

apprehension" of suit. The April 20th email stated, "[a]s an fyi, I learned that legal action will begin in

the US on April 28th regarding the patent infringement allegations against Oracle, Microsoft, and SAP."

Kennedy Decl., Exh. D.  Fewer additionally stated, "I was advised by Teilhard's corporate security

director, that Ken Prather, CEO of Teilhard, will take any calls from Oracle up to the 28th and then he

is leaving the matter to the patent infringement firm out of NYC to proceed." *Id.*

The Court concludes Oracle had an objectively "reasonable apprehension" of suit based on the

totality of the forgoing circumstances.  Fewer appeared to be working for Teilhard and the binder

contained specific allegations of infringement.  Furthermore, the two emails that Fewer sent to Oracle

stated that legal action would take place on April 28, 2006.  Oracle had every reason to believe it would

be sued for patent infringement considering these circumstances and the failed prior negotiations.

**3.      Discretion**

District courts have discretion in determining whether and when to entertain an action under the

Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdiction. *Wilton*

*v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).  The Court is not persuaded by Teilhard's argument that

it should decline to exercise jurisdiction because licensing negotiations are ongoing.  Nothing in the

parties' filings suggest that such negotiations have continued, and no evidence supports Teilhard's claim

that the action taken by Oracle was a tactical maneuver.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendants'

motion to dismiss for lack of subject matter jurisdiction.  (Docket No. 21).  The limited discovery

outlined in this Court's September 6, 2006 Order may proceed.

**IT IS SO ORDERED.**

Dated:  September 29, 2006

*Susan Illston*

United States District Court
For the Northern District of California

1

2     _____
      SUSAN ILLSTON
3     United States District Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| | |
| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>**(EXCEPT IN U.S. PLAINTIFF CASES)** | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>**(IN U.S. PLAINTIFF CASES ONLY)**<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

1 U.S. Government Plaintiff

2 U.S. Government Defendant

3 Federal Question (U.S. Government Not a Party)

4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| A. *Antitrust* | B. *Personal Injury/ Malpractice* | C. *Administrative Agency Review* | D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| 410 Antitrust | 310 Airplane<br>315 Airplane Product Liability<br>320 Assault, Libel & Slander<br>330 Federal Employers Liability<br>340 Marine<br>345 Marine Product Liability<br>350 Motor Vehicle<br>355 Motor Vehicle Product Liability<br>360 Other Personal Injury<br>362 Medical Malpractice<br>365 Product Liability<br>368 Asbestos Product Liability | 151 Medicare Act<br><br>**Social Security:**<br>861 HIA ((1395ff)<br>862 Black Lung (923)<br>863 DIWC/DIWW (405(g)<br>864 SSID Title XVI<br>865 RSI (405(g)<br>**Other Statutes**<br>891 Agricultural Acts<br>892 Economic Stabilization Act<br>893 Environmental Matters<br>894 Energy Allocation Act<br>890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| E. *General Civil (Other)* | OR | F. *Pro Se General Civil* | | |
|---|---|---|---|---|

| **Real Property**<br>210 Land Condemnation<br>220 Foreclosure<br>230 Rent, Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property<br><br>**Personal Property**<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property Damage<br>385 Property Damage Product Liability | **Bankruptcy**<br>422 Appeal 28 USC 158<br>423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>535 Death Penalty<br>540 Mandamus & Other<br>550 Civil Rights<br>555 Prison Condition<br><br>**Property Rights**<br>820 Copyrights<br>830 Patent<br>840 Trademark<br><br>**Federal Tax Suits**<br>870 Taxes (US plaintiff or defendant<br>871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>610 Agriculture<br>620 Other Food &Drug<br>625 Drug Related Seizure of Property 21 USC 881<br>630 Liquor Laws<br>640 RR & Truck<br>650 Airline Regs<br>660 Occupational Safety/Health<br>690 Other<br><br>**Other Statutes**<br>400 State Reapportionment<br>430 Banks & Banking<br>450 Commerce/ICC Rates/etc.<br>460 Deportation | 470 Racketeer Influenced & Corrupt Organizations<br>480 Consumer Credit<br>490 Cable/Satellite TV<br>810 Selective Service<br>850 Securities/Commodities/ Exchange<br>875 Customer Challenge 12 USC 3410<br>900 Appeal of fee determination under equal access to Justice<br>950 Constitutionality of State Statutes<br>890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| 530 Habeas Corpus-General<br>510 Motion/Vacate Sentence | 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | 895 Freedom of Information Act<br>890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | 152 Recovery of Defaulted Student Loans<br>(excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| 710 Fair Labor Standards Act<br>720 Labor/Mgmt. Relations<br>730 Labor/Mgmt. Reporting & Disclosure Act<br>740 Labor Railway Act<br>790 Other Labor Litigation<br>791 Empl. Ret. Inc. Security Act | 441 Voting (if not Voting Rights Act)<br>443 Housing/Accommodations<br>444 Welfare<br>440 Other Civil Rights<br>445 American w/Disabilities-Employment<br>446 Americans w/Disabilities-Other | 110 Insurance<br>120 Marine<br>130 Miller Act<br>140 Negotiable Instrument<br>150 Recovery of Overpayment & Enforcement of Judgment<br>153 Recovery of Overpayment of Veteran's Benefits<br>160 Stockholder's Suits<br>190 Other Contracts<br>195 Contract Product Liability<br>196 Franchise | 441 Civil Rights-Voting<br>(if Voting Rights Act) |

## V. ORIGIN

| 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from another district (specify) | 6 Multi district Litigation | 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

## VI.  CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

| VII. REQUESTED IN COMPLAINT | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 | **DEMAND $**<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES          NO |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | (See instruction)          YES          NO | If yes, please complete related case form. |
|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
#### Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  Listed below are tips for completing the civil cover sheet.  These tips coincide with the Roman Numerals on the Cover Sheet.

I.          COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C.,  and 99999 if plaintiff is outside the United States.

III.        CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

IV.        CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint.  You may select only <u>one</u> category.  You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.        CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.       RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.